There are not stipulated in the court records. The attorneys that are going to address the court will step off and identify yourselves for the record. Good morning, Your Honor. Anthony Pesci, P.E.S.C. Good morning. Good morning, Your Honor. Assistant Attorney General Evan Ellison, on behalf of the people of Pennsylvania. Good morning. Today, we are here to have an oral argument on this case. But I also wanted to, before we start, note that the state has filed a motion to cite additional authority. It's filed on the court. Do you have a copy, Mr. Pesci? We have received it, Your Honor. Do you have any objection to the court granting this motion? We do. Both of you can discuss it if you wish. We do not. So then we will allow the motion to cite additional authority. And both of you will have about 15 minutes to present your argument. And from that, Mr. Pesci, you may save up some time for rebuttal. Thank you. You may also be seated, and Mr. Pesci, you may proceed. Please be seated. Will it please the court? Good morning. My name is Anthony Pesci of Winston-Ewing Strong, and I represent the appellant, Mr. Lieberman. Mr. Lieberman rolled out this morning, as he has for the last 17 years, in civil custody of the state of Illinois. And the question that the people must answer to Mr. Lieberman is why. The answer to that question has changed dramatically in recent years. And the consequences of that change is why we are here today. And why, let me ask you this question. How do we know that Mr. Lieberman won't be a repeat offender? With respect, Your Honor, Mr. Lieberman's burden is not to prove that he will not be a repeat offender. He is in custody because he was determined to have a mental disorder which compiled sexual violence. The basis for that commitment was that he had, according to the state and its evaluators, as well as his court, and our state's Supreme Court, had a disease known as peripheral or not otherwise specified. Now the state and its evaluators have determined that Mr. Lieberman does not have peripheral or not otherwise specified, and in fact never did, but suffers from a completely different disorder. But who said, who said, Mr. Pesci, that he never suffered from peripheral or not otherwise specified? What medical testimony is in this record that says he never suffered from peripheral or not otherwise specified? Dr. Wild, the state's evaluator. All right. Now, is that really an accurate statement of her testimony? Her testimony, if I may paraphrase correctly, was that she believed that Mr. Lieberman always suffered from sexual ascetism, and that the diagnosis of peripheral NLS was, using my own language, a compromised diagnosis, because, in her words, she felt that she did not have the basis to diagnose Mr. Lieberman with sexual ascetism until October of 2013. Didn't she specifically, wasn't there a deposition in this case? There was not in this case. And it was after the court ordered that there be one. Correct. And she was abstaining sensibly, wasn't she? That's correct, Your Honor. Did you do a cross? I took the deposition. You took the deposition. All right. Didn't she tell you that she didn't disagree or said that she wasn't saying that there were factors that could still imply that he suffers from peripheral or not otherwise specified? That's true, but in her opinion, Mr. Lieberman did not suffer from peripheral NLS. In fact, he suffered from a distinct disorder known as sexual ascetism, and in her testimony, that he always suffered from that disorder. And didn't she say that peripheralia is an ongoing disorder? It doesn't go away. Did she say that? Yes, she has said that both in the previous serotonin diagnosis and again later. And didn't she say that it hasn't gone away? Didn't she agree that the disorder, peripheralia, has not ever gone away? Without quarreling, I believe that Dr. Wright's testimony was that, and her opinion as written in her reports, is that Mr. Lieberman has sexual ascetism, not peripheral. Right. She said it's a more, what? Poignant diagnosis. I mean, I'm using... Now I'm paraphrasing. Okay. She said that the reason that she chose to categorize it as sexual ascetism is because of the new, what she read as the new provisions in the DSM-5 that permitted this more specific diagnosis. And that she said he really still suffers from peripheralia, except that now she can specify that it's sadism. Because she was of the opinion that in the past there had to be an acknowledgment by the person suffering from the peripheralia that they had certain, I forget, can't think of the word right now. Whereas now, in her opinion, DSM-5 does not require that those, and I'm sorry I can't figure the word, I'm being self-reported that that doesn't matter anymore. That was her opinion. Yes, I think your Honor has fairly summarized the testimony. And with respect, Mr. Lieberman disagrees and has presented evidence of disagreeing with the vast majority of the testimony from Dr. Weidel. You mean Dr. First? Yes. Did Dr. First opine at all about a plausible account that there's no probable cause to believe that he won't reoffend? The short answer to your Honor's question is no, he did not. Dr. First's affidavit testimony was submitted with the express intent of addressing for Judge Porter at the court below this question, which was put forward by the state initially and then later abandoned, that peripheralia are not otherwise specified and sexual sadism are somehow interchangeable with one another, or are related enough that Dr. Weidel's change from PNLS to sexual sadism did not qualify as a substantive change in diagnosis. And it is on that question that Dr. First's affidavit testimony and opinion was directly relevant. The question of whether or not these disorders are related, the question of whether or not the diagnostic criteria, which must be looked at to determine whether a person has these disorders, are related, and whether or not specifically Dr. Weidel's explanation and understanding of the requirement for a self-reporting in the DSM, was in fact a requirement of those versions of the diagnostic manual. Well, when the jury found Mr. Lieberman a sexually violent person, was there more than one diagnosis that had been testified to? There were. What was the one that remains today? Antisocial personality disorder, I believe is what your Honor's referring to. All right. So has anyone said he doesn't suffer from that? Validators in the past for Mr. Lieberman have said that he does not suffer from ASPD. Dr. Weidel says that he does continue to suffer from ASPD. If I may, drill down on that issue specifically. Sure. It has always been the state's position, and it was the state's position in 2006 during the jury, and before this court, and before the state Supreme Court, that antisocial personality disorder is a complementary diagnosis to paraphilia NLS. And in no instance under Illinois' SCP Act has ASPD ever been considered to be the sole basis for commitment. It has always been, in addition to a paraphilic disorder, one that compels sexual violence. Is there something, though, in the statute that actually says what you're arguing? On the ASPD issue specifically or on the definition of a mental disorder? Either or. Take your pick. Yes, the statute specifically defines what a mental disorder is. It says that it has to be a mental disorder which compels sexual violence over the volition of the... All right. So that doesn't really rule out the antisocial personality disorder, does it? Does the statute in any way rule that out? The statute in and of itself does not. Now let's go to the case law. Any case law interpreting the sexually violent personality disorder. Any case law that says you cannot add this in a singular setting so that a person can be found a sexually violent offender. I would point the court to inward detention of rights. All right. Where two state experts testified that they did not consider ASPD a mental disorder as defined by the act. And this court noted the controversy surrounding its use as the sole basis for commitment. I would also point the court to federal statements by the state in Mr. Riedemann's case. Yes. Where the state argued, and its evaluators testified, that paraphilia did not, nevertheless, specify a relatively committing disorder and that ASPD was complementary to it. All right. Now let's get back to something you said initially about the hoarding system. Is there any burden on Mr. Riedemann? Yes, there is. All right. What is that? Mr. Riedemann, on a petition for discharge under Section 65, and I'm referring specifically to our Supreme Court's decision in Inmate Sandwich, found that Mr. Riedemann must show a plausible account that a change in circumstance has occurred. Yes. The court defined what a change in circumstance may be. Yes. That he is no longer a sexually violent person. And specifically, in fact, that's certainly in the mind of that decision. No, before you get into that. Yes, Your Honor. In determining plausible here, has Mr. Lieberman, in all of the years that he has been incarcerated, has he received any treatment? Has he committed himself for any treatment whatsoever? The answer to that question is yes. Mr. Riedemann receives some forms of treatment while he is at the facility. He has not, however, anticipating Your Honor's next question, voluntarily submitted himself to sexual, some sort of specific treatment at the program based on his disorder. But he does participate. I mean, he raped 17 women. Isn't that true? I believe that he has eight specific convictions, Your Honor. Okay, well. In any event, he has received no treatment for that type of conduct, yes. He has not gone into specific treatment at the facility. He receives some forms of treatment at the facility through therapies, group therapy, several other kinds of therapy. Has any doctor then said that this treatment makes it likely that he won't reoffend? Not that I'm aware of. I'd like to refocus the Court's attention, if I may, on the specific issue which is before you, which is not whether or not he will reoffend statistically, but not whether or not it is predicted that he will reoffend. You can get it back to where you want. And that's fine. We're going to give you every opportunity. But are you suggesting that under the statute he doesn't have to show that it's not likely that he won't reoffend for either a discharge or a conditional discharge? Doesn't someone have to say that it's not likely that he'll reoffend if he's discharged? With respect, Your Honor, no. We are in a very weak circumstance here where the state's doctor has substantially changed the diagnosis to a distinctive disorder which was never submitted to any jury. And that is, as of this morning, the basis of why Mr. Lieberman is in custody, not because of his jury. Mr. Pesci, you didn't try that jury, did you? No, I did not, Your Honor. Did that jury actually conclude that he suffered from paraphilia not otherwise specified, and therefore he was a sexually violent person, or was there something else that they determined? I believe the question submitted to the jury was whether or not Mr. Lieberman was a sexually violent person. And what are the standards or the requirements for the state to establish for that jury before he may be concluded to be a sexually violent person? Can you refresh us on that? Yes, I can. That he has a mental disorder, which makes it substantially probable that he will commit acts of sexual violence in the future. All right. Now, you can direct us like you want now to something that you think is important for us to look at, and we will listen and hopefully gather something to get in front of us. Thank you, Your Honor. What I would point the court's direction to in answer to Justice Gordon's question is the question that's set out in the standards and under the Act, Section 65, is not that Mr. Lieberman must show that he is no longer dangerous. That can be statistically shown. Mr. Lieberman is not in custody because of a statistical conclusion. He is in custody, and this is found specifically from the United States Supreme Court in Kansas v. Crain and Kansas v. Hendricks, as well as our court in Samuelson, because he has a mental disorder, which compels violence. And the very question of whether or not he has that mental disorder has now been thrown wildly into challenge. The only disorder that compels sexual violence that was submitted to the jury was paraphernalia not otherwise specified. And now a new doctor has said he doesn't have that disorder. He has a new disorder. She doesn't say that. You're actually changing her testimony. But if we want to refer to the U.S. Supreme Court in Boucher v. Louisiana, the statement beholding is that due process permits an individual to be held as long as he or she is both mentally ill and dangerous but no longer. If you have a burden, which you agree you do, and that burden is to show that he is not dangerous, I think it's a little more precise than that. Is there any medical testimony that would support his conditional release or release based on some plausible account of a mental health professional that Mr. Lieberman no longer is likely to reoffend if he is released? I don't want to quibble with the court. The answer to your question is on the record before you, there is no current testimony from any doctor that Mr. Lieberman is not likely to be dangerous. Didn't she in her depositions state that she contradicted her earlier opinion and said that she thought that maybe she believed that maybe he did always have sexual sadism? That's correct, Your Honor. The fact that I did testify that she believed that Mr. Lieberman always had sexual sadism and contradicted her earlier. What does the judge say? Is she saying that maybe she always believed that he did have it but she didn't diagnose him with it? Does that really make a difference to you? I believe it does, Your Honor. The basis for Mr. Lieberman's commitment, as this court and the Illinois Supreme Court in Sandbridge found, is the 2006 jury verdict that he has a mental disorder. And as this court has said, and I believe specifically Your Honor has said, Mr. Lieberman has paraphernalia not otherwise specified. That's why he's in custody. That is not true this morning. Well, the fact is that she basically said that she is not saying that others could not know that he suffers from paraphernalia not otherwise specified. But forgetting about her testimony, for just a moment, is there any testimony from any doctor over the years that paraphernalia not otherwise specified or specific paraphernalias like the one that she's saying more aptly describes his mental disorder today, is there any medical testimony anywhere that in any way contradicts that this is a chronic and we're talking about the broad umbrella now, paraphernalia, those that are not otherwise specified and those that are specified. Is there any medical testimony anywhere in this record that suggests that paraphernalia, and I'm talking about all types, those that are specified and those that are not, is a chronic, lifelong disease that does not go away without some form of treatment? The answer to Your Honor's question is no. If I may add one small point. Sure. There is a factual distinction, which I don't think the state has shown, and which Mr. Lieberman contests, as well as Dr. First's testimony contests, that there is a broad, broad concept of a paraphilic disorder. No such thing exists. It's not part of the DSM. It's not part of the testimony of any doctor, with the exception of Dr. Wallo in 2014 in her second deposition after this change. These are distinct disorders. The Diagnostic Manual has instructed that they are distinct disorders with distinct criteria. Dr. First has testified that they are. They are not part of a kind of flu, for example, swine flu or botulism. It's not a menu. These are distinct disorders with distinct behaviors and criteria. One who has sexual sadism behaves in this way and is compelled to these kinds of acts. One who has a different disorder is compelled to act in a different way with different criteria for diagnosis. They're not related. And that point is important because it goes to Your Honor's question as to whether or not there has been a change. And specifically something that Your Honor says, that Dr. Wallo testified that others could opine. And that's certainly true. Others may opine. We're not here because of what others may opine. We're here because in the State's position, Dr. Wallo has determined that Mr. Lieberman had sexual sadism. That disorder, according to the only testimony before November, is distinct from paraphilia, not otherwise specified, and was never submitted to any jury. It's actually a very simple concept that is removed in many ways in a very serious way from what is compensated under the Act. There is simply no basis in any section of the SUPS for changing the basis for commitment, the diagnosis. But again, you're suggesting that the jury concluded something that they didn't conclude. The jury determined that Mr. Lieberman had a mental disorder. Yes, they did. That was really their only charge. And what else? He was substantially at risk in the next trial. And what is the burden upon each annual, after the annual report? I guess we've already been through this. It's your burden. Now, this doesn't seem to have been actually considered before in Illinois cases, what we're talking about today. Would you agree? I would agree. What do you say to the out-of-state cases that they cite? Those cases deal primarily with a distinction, which is not an issue in this case, where the disorders change in name only. And this state has dealt a little bit with that. Yes, but they have been raised? Yes, sir. All right. But are you sure that cease is really about nomenclature? With respect, Your Honor, in those cases there was evidence that the diseases were significantly belabored enough that the change in nomenclature did not count as a distinction in disorder. And the DSM bore that out in support of the ultimate conclusion was the shift from, I believe in Hayes it was a change from PNOS to OSPD. You know, I know this is really putting you on the spot, but you must be quite familiar with paraphilia, not otherwise specified, and also teplicated. I'm getting there, Your Honor, yes. Do you think that there's any similarities at all in any of the qualifiers or quantifiers that the medical scientific community uses in reaching those different disorders? And no doubt there's testimony that even Dr. Weidel says they're not the same. I think the evidence, excuse me, I think the record in this case is actually replete with evidence that shows the distinctions between those disorders. What are they? Give us the real solid distinctions between sexual sadism, paraphilia, sexual sadism, and that they're not otherwise specified. In layman's terms, the understanding, Mr. Lieberman, and from Dr. First's testimony, is that sexual sadism is a disorder which compels extreme sexual violence at the suffering of the individual. Which one is that? Sexual sadism. Okay. And that manifests itself as laid out in the DSM 3 through 5, several criteria which show as evidence of that disorder, bringing physical harm to the victim, et cetera. Yeah. Did any of that happen here? In Mr. Lieberman's case? Yeah. Our position would be no, that the disorder does not apply to him. However, we've never had the opportunity to litigate that issue factually. It's never been submitted to any fact finder. All right. And in fact, if we want to go down this road, I think that Mr. Lieberman's position would be that there is no evidence in the record, and Dr. Weidel testified that she found no new evidence in the record to support her decision, that it was based entirely not on the conduct of his crimes or her opinion of Mr. Lieberman, but on a change in the diagnostic criteria in the DSM 5, specifically in the preamble to the diagnostic criteria. The criteria themselves, Dr. Weidel testified, have not changed substantially over the years. Now, to answer your own question, that gets contracted against periphery, not evidence specified in non-consenting females, which is the disorder that Mr. Lieberman was originally diagnosed with, beginning all the way back in 2000, including Dr. Weidel, up until October 2013. And that disorder is less specific. It is not otherwise specified, and its defining criteria are a general peripheral behavior towards non-consenting females without any of the other specifiers that are seen in the other peripheral disorders identified in the DSM. Was Dr. First ever asked during his deposition regarding the defendant's conduct after he was incarcerated, you know, with the calling to women that he, you know, had attacked, and the incident in the bathroom, things of that nature? And did he put in the categories to how he would define that conduct? Dr. First was not deposed in this case. He submitted two affidavits, and he did not specifically evaluate Mr. Lieberman's conduct. His opinion is solely to the way that the DSM is written, its use, and to his understanding and opinion, medical opinion, about how diagnostic criteria are used in evaluating these disorders and whether or not those disorders are distinct. Did anybody evaluate that conduct post-trial? Yes, evaluators have, both for Mr. Lieberman and for the state. It has been considered in evaluations by Dr. Whitmer, Dr. Swearer, Dr. Weidel, Dr. Schmidt, on and on. And how did they categorize? In, without testifying for the state, I believe that their doctors found that it contributed to their conclusion that Mr. Lieberman had paraphernalia, not as it was specified. Is there any testimony in the record now that says, was there someone that said he doesn't suffer from paraphernalia as a white male? On the current record, based on the latest petition for discharge, no. We specifically dealt with this issue at Judge Porter's instruction. Whether or not the change in diagnosis warranted either discharge, as Mr. Lieberman advocated, or a new trial, those were substantial questions of law before his honor, which were not ultimately taken up based upon his eventual decision. Now, would you say that if you asked Dr. Weidel this question, how would she answer it? Maybe it's in that deposition somewhere. But if it were found that an evolving diagnosis based on the same symptoms does not mean that Mr. Lieberman's condition has changed. I'm sorry, Your Honor. Are you asking me how I think Dr. Weidel would answer that question? Yeah. I mean, maybe it's actually in there. But do you think that she would agree with that statement or say that that statement is inaccurate? It would be hard for me to guess, Your Honor. I suppose Dr. Weidel being an evaluator for the state engaged in this business, she would say that Mr. Lieberman should remain in custody. Well, did she say, though, I mean, isn't the essence in her deposition that an evolving diagnosis based on the same symptoms does not mean that Mr. Lieberman's condition has changed? The mental condition, the mental disorder, if you will, that a jury determined was such that if he were released, he might or he would re-offend, a sexual offender. Without quibbling, Your Honor, I think that that is fair phrasing of Dr. Weidel's testimony. She did testify that, in her opinion, that Mr. Lieberman's diseases, at least initially her testimony was that those diseases were somehow related. She, as Mr. Lieberman's counsel, I found that explanation to be lacking, especially in light of Dr. First's testimony. Ultimately, one of the questions that this court must resolve is whether or not the court, the role aired in not properly resolving that very question, which is whether or not these diseases are related enough such that the state can change its diagnosis without affecting a due process issue or a statutory problem under the Illinois Sexually Violent Persons Act. Well, now, when you just described earlier the difference between sexual sadism and paraphernalia not otherwise specified, you know, maybe I didn't hear you right or not, but it sounded like the paraphernalia for sexual sadism is marked by violence. Is that correct? Yes. An incredibly simple explanation would be yes. I'm sorry about that. So really, are you really suggesting that there's absolutely no connection, that there couldn't possibly be any connection between the definition of what you described as sexual sadism and what you also described are the cornerstone markings of paraphernalia not otherwise specified? I want to answer your honest question fairly. I think that the record is clear that these disorders are different. Is there some Venn diagram where there's overlapping conduct in between that may be relevant to both? I think Dr. First and Dr. Leiter would both answer that question. Yes, there is. There is conduct which may fall into this category of disorder or that category of disorder. The relevant question in the inquiry that should have been undertaken at the court below is whether or not those disorders are distinct enough that changing the diagnosis triggers a problem under the Act. And it's Mr. Lieberman's position that the failure to undertake that question as well as the answer to it is these disorders are distinct and the change from one to the other without some procedural safeguard, where we have at least a finding of facts beyond a reasonable doubt that Mr. Lieberman had this new mental disorder, violates the very due process protections that are built into the Act to protect Mr. Lieberman's liberty and constitutional rights and violates the entire purpose of the Act, which is to find a person with a mental disorder. Is the only purpose of the Act to simply assure that Mr. Lieberman's rights are not violated? The Act certainly serves two purposes. What's the other purpose? To protect the people of the state of Illinois. From what? From violent individuals. From re-offending, right? Yes, from violent sexual offenders. How are we ever going to get to where you want to go if we don't have some plausible account that he's not going to re-offend? Is that part of the statute? Do we throw it out? What do we do with that part of the statute? Are we bound by that or not? Is that an interest here? Mr. Lieberman is not advocating that we revoke the statute. Let me ask you this very simply. Yes, Your Honor. When we talk about Lieberman establishing a plausible account that he's no longer a sexually violent person, I would think, to make that very simple, that he would have to submit himself to treatment that is suggested, not decide what treatment he wants and what treatment he doesn't want. And if he takes all of that treatment, you see, then it may be plausible, if there's conclusions by a psychiatrist forgetting about diagnoses, that he's no longer a sexually violent person, he may be able to get out. And that has never been done. You're saying, well, they changed the diagnosis and that's basically unconstitutional. You can't go around doing that. And I don't know that they did change the diagnosis. That's just the way you see it. We may see it differently. But if you're doing this man a service, I think what you have to do is make sure that he takes whatever treatment is recommended, even if he doesn't believe it or want it, then it might be very plausible that there's an opinion by a psychiatrist that he's not sexually violent, that he could get out. Otherwise, I don't see you going anywhere but down a dead-end street. Thank you, Your Honor. To address your concern, Mr. Lieberman has not participated in that treatment. There are two issues with that, as of this morning. The first is, if he had been participating in the treatment, what disease would it have been for? Dr. Weiler testified that she does not participate or have any understanding of the treatment, and now his treatment has been changed or would be changed if he had been submitted to it, because the disease is different. The second question is... Do you really think that you can accurately say that a psychiatrist or qualified psychologist or any qualified mental health individual would actually agree with your statement that the treatment for sexual sadism, a form of paraphilia, and treatment for paraphilia not otherwise specified, would be entirely different? I mean, is that something you can be qualified to say? I'm not qualified to say that. You did say that because this diagnosis has changed, that the treatment for this new diagnosis would be completely different. I mean, that's not in the record. There's nothing that would even support that. I think it's out of everyone's league here to start talking about a fact such as that, that there would be treatment that would be substantially different for Mr. Lieberman. I'm not arguing with you, Your Honor. I did not say that it substantially would be substantial, but I don't know. The question is an open one. Well, Dr. Lieberman did say that his condition has not changed. He said that. He said his condition has not changed since his last examination and that he had not made sufficient progress in treatment to be conditionally released. Justice said that he didn't have sexual assault with him. Sure, but at the end of the day, the jury didn't find him guilty, or find him, rather, to be a sexually violent person because of this diagnosis that you're hanging your hat on and that you're putting everything into that basket. They had to find that he had suffered from a mental disorder and that if it wasn't like this, then he would reappear. I mean, I think you're taking lumps. If I may respectfully disagree with you, Your Honor, Mr. Lieberman's position, and I think the record supports this, is that, yes, the question submitted to the jury was, does he have a mental disorder? And the answer was yes. The only evidence ever submitted to that jury was that he had PNLS and that PNLS is what compels his diagnosis and that because of that disorder, he needed to be remanded to treatment at a secure facility and locked up. There never occurred evidence of sexual assault with him. Mr. Lieberman was never allowed to contest whether or not he had sexual assault with him and still has not been allowed to contest that. Why couldn't he do it at the last hearing? I mean, why couldn't he actually present evidence that he doesn't suffer from sexual assault? Who precluded that? If, Your Honor, if Judge Porter had decided that the procedure to move forward was to have an evidentiary hearing on whether or not sexual assault with him was a disorder and then had also resolved the legal question of what burden to apply and whether or not under Section 65, Dr. Wiley's change in diagnosis, warranted that new procedure, then perhaps we would have that trial. Forgetting for a moment about a trial or a hearing, you actually had Dr. Hurst testify by way of a deposition, right? No, by way of that statement. Okay, by way of that statement. What precluded you from having someone say that he's never suffered from sexual assault with him? There have been hearings in the past where there's been contrary testimony, hasn't there? There have been probable cause hearings, yes, and submissions and depositions. What precluded it here? Are you saying, Matt, that the judge precluded that? No, Your Honor, I'm not saying that we were precluded from presenting that testimony. The question that we presented to Judge Porter was, and Judge Porter initially indicated, and the record has been submitted to the court, that the question that he wanted to investigate was whether or not the diagnosis was a change in disorder, excuse me, a significant enough change that warranted some sort of act under the SCP Act. And we presented that evidence, and ultimately His Honor made a ruling based on a later argument by the state based on further. And it's Mr. Lieberman's position that that was an abuse of the court's discretion because it left several significant legal and factual issues unresolved, one of which is whether or not Mr. Lieberman even has sexual assault with him or whether or not, as a new disorder under an earlier part of the Act, Section 15, I believe, the state is required to at least establish probable cause that he had it. And Mr. Lieberman submitted several questions to his Honor, Judge Porter, that Dr. Weidel's opinion was unqualified and incredible based on her previous testimony and that there was no evidence in the record to prove that this new, different diagnosis. We followed that argument. All right? Standards says we need to look at plausible evidence of changed circumstances. All right? So we have a doctor, Dr. Furst, who we've already indicated looked at records, looked at documents, so on and so forth, never examined Mr. Lieberman, and yet, you know, he all finds a different type of mental disorder. Then, following along with your argument with Dr. Weidel, you say that what she says this is what she says that. Where is the plausible evidence for us to consider that there was a change of circumstances? Simply put, Your Honor, the change in circumstances is the change in diagnosis. There are different disorders with different diagnoses that are worth the plausible evidence, and yet, you have two contradictory opinions between two medical experts. And with respect, Your Honor, especially in light of Dr. Weidel's credibility issues, I think that that more than satisfies a plausible account as to a factual dispute about whether or not Mr. Lieberman has sexual assaultism, as whether or not these disorders are distinct, and whether or not his commitment can continue based on that new diagnosis. But the answer to Your Honor's question about standards is the change in diagnosis is a change in circumstance. He was held on Monday morning for TIS, and Tuesday, it's because of sexual assaultism. That is fundamentally a change in his condition as a committee of the state. But Dr. Weidel, under oath, in the deposition, in the record, in this case, said contrary to what you just said, she said respondent's condition has not changed since his last examination, and that he had not made sufficient progress in treatment to be conditionally released. She said that, not me. I'm reporting what the record says. She's the one that opined his condition has not changed since his last examination. What are we to make of that? It's a direct contradiction to her testimony in 2013, and in that very deposition, that A, sexual assaultism and paraphernalia are distinct disorders with distinct criteria. B, that she earlier thought that he had sexual assaultism and not PNLS, which is a new fact that comes to light in 2014. It directly contradicts her testimony from 2013 that he did not have sexual assaultism, but in fact does have PNLS. Yes, she said his condition hasn't changed. She's also said that his condition has changed. Now, regarding the statute, and actually, I think that case law from other states that has faced the issue actually would support her testimony. But, is there anything that you think suggests that we are to completely disregard the absence of any evidence that he is not likely to re-offend? No. My response to that question is no, but the Supreme Court's standards, as well as instructions from the nation's Supreme Court, is that Mr. Lieberman, in order to be held in civil custody under Illinois' Act and Act Legit, is that he must suffer from a mental disorder and be substantially likely to re-offend. Okay. What do you say to the latter portion of that? Are we to ignore it? No, you're not to ignore it, Your Honor, but their verdict must be present. Yes, so... He cannot be held on dangerousness alone. That brings us into a very dangerous territory where all courts have unanimously said that we cannot keep people in jail or in some sort of secure custody based on a risk of recidivism alone. We would have to lock up half the city. All right. And so we have testimony that Dr. Weidel says that he suffers from sexual sadism, although she agrees that it would not be inconsistent for others to still say he has paraphernalia not otherwise specified. We have case law from other states suggesting that when it's really not a change in the condition that the legislative enactment that requires that there be a showing that the person would not likely to be re-offended, it's part of the whole equation for release, either conditional or otherwise. I'm not quibbling with Your Honor that dangerousness is a component of the Act. Yes. Mr. Lieberman's position is that having a mental disorder is also a part of the Act. Yes. And, in fact, you must have both. Otherwise, we're heading down a bad road. With that understanding, the question before Judge Kohler and now before this Court is what effect under the Act is the change in diagnosis? Does it substantially change the original commitment from 2006? Does it change our understanding of what a mental disorder is or what mental disorder Mr. Lieberman allegedly has? That comparison dangerousness. They are interrelated. And for the State to admit that he should not be kept, with its own expert, that he should not be kept under penalized, that should instead be kept under a different disorder which has never been challenged, never submitted to any jury, and that confinement can continue uninterrupted. Let me add to the original question of protections that are built into the statute. Let me ask you this. Let's say I buy into your argument. Okay? So what you're telling us is that if the original diagnosis for commitment later changes and he's still a dangerous person, that we could let him out. Is that what you're saying? Yes, Your Honor. If, as it were, the original diagnosis changed, we have no fiduciary relationship towards the public safety, and we let out a dangerous person because the diagnosis has changed. Do you believe that we can do that? Do you honestly believe that? Your Honor, with respect, this court and the courts in Illinois do something similar all the time. When the basis for confinement, criminal or civil, changes, dangerous people are let out. This court and the state is not in the business of keeping, quote-unquote, dangerous people in custody. It is in the business of keeping criminals behind bars and is keeping people with mental disorders away from the public. And it's the basis for any kind of change. Okay, but what you just said, to keep mentally sick people away from the public, yes, that's the purpose. So if the diagnosis has changed and he's still a dangerous person, that's certainly what the state says, Your Honor, that the diagnosis has changed, but he's still dangerous. Mr. Lieberman's position is that, A, the state is not permitted under the Act to just change the diagnosis if it seems fit. If he's able to show that he does not have the original diagnosis, But the idea with that interpretation is that you believe that we can let out a dangerous person on the streets again under this particular Act, which is designed to confine dangerous people in prison. It's the opposite of what the purpose of this Act was. With respect, Your Honor, the purpose of the Act is to confine people with mental disorders that are dangerous. And once the basis of that original commitment, as the court told us in Sandbridge, is shown, at least plausibly, to no longer be accurate, something has to happen. Mr. Lieberman's confinement, that's concomitant indefinite commitment. I don't quarrel with you on that. As long as the person continues to have a mental disorder, he'll be dangerous. So, as to where you're at when you're looking for a miscord, it's that we remained at that for a year. We've asked for two kinds of relief in our papers, Your Honor. The first is we believe that he's entitled to discharge under the Act based on his state's admissions alone. But following up with Justice Gordon's questions, the second part of the statute hasn't been satisfied. And with respect, Your Honor, Mr. Lieberman's position is that we don't have to satisfy both parts. The statutes don't have to satisfy both parts. Mr. Lieberman had a mental disorder, and that mental disorder must make him substantially probable to commit an act of sexual violence. And as it stands this morning, the state is well outside of the basis for that commitment. Did Sandbridge in any way change, I mean, is there something that we've missed? Sandbridge says that respondents must provide a plausible account that the committed person is no longer a sexually violent person and that he no longer has a mental disorder, and furthermore, he's no longer dangerous to others because the mental disorder no longer creates a substantial probability that he will engage in an act of sexual violence. That's exactly right, Your Honor. It is a two-pronged question. Either he does not have a mental disorder anymore, or he may have a mental disorder. Did anyone say he doesn't have a mental disorder? No. No one said that he doesn't have a mental disorder. So where is your plausible account then? The plausible account is that the disorder for which he was committed is no longer adversated by the state. The fact that they say that he has a new disorder is not the same thing. That gets into a secondary issue of whether or not he has a mental disorder. It's a very nuanced argument, but I understand. You're saying that because Dr. Weidel said this, he no longer suffers from a mental disorder. Yes. As straightforward as possible, Mr. Rubin's position is that you cannot change his diagnosis without engaging the acts of protection. All right. Well, I want to just briefly bring you back to what her primary conclusion is. And that was, this is what she wrapped it up with. Bear with me. Here's how she concluded it. Can you tell me if this is something different than the act itself, if she pulled this out of thin air or not? Or if this was actually the basis on which a jury found that he was a sexually violent person. She concluded, respondent suffers from one or more mental disorders which are congenital or acquired conditions affecting his emotional or volitional capacity and predisposing him to engage in acts of sexual violence. And that as a result of respondent's mental disorders, it is substantially probable that he will engage in acts of sexual violence. Yes, that was her conclusion. Is that a statutory basis on which a person may be declared a sexually violent person? Yeah, unless they change the mental disorder. Well, what do you mean, yeah, unless they change the mental disorder? She made a conclusion based on the very language that the statute requires. That's what she said after you proposed to her. I don't disagree that Dr. Weider repeated the language in the bottom of her report. All right. But it is, I think your position is it's not plausible. What she's saying is it's not plausible, and what you have said with Dr. Burst and considering her testimony, that you have raised questions that it is plausible that he doesn't suffer from a mental disorder. I would agree 100% with your honor and only add we have also raised the issue that the change in condition itself, the change in diagnosis itself is an independent reason under the Act to warrant discharge for at least a hearing on the legal consequences of a change in diagnosis as well as the factual consequences of the change. All right. Thank you. We're going to give you some time for rebuttal. Thank you, Your Honor. All right. Get out of here, if you would. Good morning, Your Honor. Thank you for... Much of what Respondent has just addressed has to do with a credibility determination, which is not relevant at this stage of proceedings, which is the probable cause stage of reexamination. The only salient and disconsolation here at the probable cause stage is the fact that Respondent has not presented anyone who can imply that he does not have a mental disorder or that he's no longer dangerous and is no longer an SVP. And the reason that he won't discuss this is because presumably nobody is willing to provide this opinion. In this case, Respondent had an expert, but that expert did not evaluate him. The expert could have, but did not, and did not opine on Respondent's mental condition. Let me ask a question. Did anybody ask the doctors whether or not it's possible someone may have multiple mental disorders and when they might manifest themselves? I believe that they did ask that question of Dr. Weidel, and Dr. Weidel said that he, in fact, does suffer from multiple mental disorders. In this case, that Respondent suffers from both sexual slavism and antisocial personality disorder. So in that instance, yes, he does suffer from two disorders. Dr. Weidel also provided testimony that a response that some experts might opine that he suffered from pedophilia, not otherwise specified non-consent, whereas others might opine, based on their own comfort levels, that he suffered from sexual sadism. And that has to do with the very nature of expert opinions. They're inherently opinions based on professional experience. So each expert about the manifestation. Is there anything that would plot the manifestation of one mental disorder over another at any particular time? I'm not sure I understand your question. Originally, he was diagnosed with one mental disorder, then Dr. Weidel indicated that he had another mental disorder. So is there any questions during that position as to when these might manifest themselves? So as to whether or why this hadn't changed in this case, Dr. Weidel testified that there was not actually any change in the underlying condition itself, meaning that there was a change in professional knowledge based on the release of the DSM-5, which allowed her to make a different diagnosis. And that's one way that a diagnosis might change. If there's circumstances in the professional field that change, then that would suggest that the title of an individual's diagnosis is different or that an individual can now be diagnosed with another disorder based on the criteria, then that would be permitted. There are also a number of other reasons why an individual's diagnosis might be changed. For example, much of what occurs in treatment is that an STP is engaging in There's a five-phase procedure for treatment. In phase two of treatment, the primary focus is on disclosure of their previous offenses, their offending behavior, so that the individual can recognize what their symptoms are, what disorders they have, the full extent of those disorders, and then go on to engage in treatment of those behaviors. So there could be instances where an individual's diagnosis would be changed or increased or there would be additional diagnoses made based on disclosures that are made during treatment. And then based on those disclosures, the individual can move on to developing the necessary tools in order to be discharged. Is the respondent established by way of this testimony from not only Dr. Biden but Dr. Birx that he no longer suffers from a disorder? No. In fact, that's our primary argument here is that a respondent has the burden at the probable cause stage to provide a plausible account based on an expert opinion he's no longer an STP, the definition of an STP being that he has a mental disorder and that he's substantially probable to re-offend based off of that mental disorder. So the fact that that mental disorder has now changed, at least the doctor has categorized it in a completely different fashion, isn't that a suggestion that he doesn't suffer from a mental disorder? No, and this is an academic exercise about whether or not a respondent's mental disorder, which he does not challenge it with any expert opinion, is such that he seeks sexual arousal from the fact that his victims are non-consenting or from the fact that his victims are non-consenting and that he's inflicting physical and psychological suffering. That there's no argument whatsoever that he does not have a mental disorder and he's provided no expert opinion suggesting that he does not have a mental disorder. How did you address Stambridge, which indicates that he no longer has the mental disorder from which he was already adjudicated in 2006, which is I believe that's what the respondent's argument is, that he was adjudicated with a certain mental disorder in 2006 and now the game has changed. Your Honor, that respondent has continually drawn from a single line in Stambridge that when read out of context might be interpreted as suggesting that the criteria on reexamination is whether or not the individual continues to suffer from the mental disorder upon which his initial commitment was based, but that's actually not what Stambridge stands for  The reason the court makes that statement is because a respondent in that case had repeatedly presented an expert opinion that did not address the issue of whether a respondent had a mental disorder, but rather was consistently arguing that PMS non-consent was not a legitimate disorder. And the court was saying there, we've addressed this, you've been adjudicated as an SBP, that PMS non-consent clearly qualifies as a mental disorder under the Act and they're not re-litigating this issue anymore. What you need to do now is address whether or not you remain an SBP or are no longer an SBP. And so there's no other language within Stambridge that suggests that that particular line is meant to mean what a respondent is suggesting that it means. So it's out of context, it might be interpreted that way, but upon reading Stambridge in full and understanding the context within the statement is made, it's just not a correct statement. If I can very briefly discuss the issue that respondent seems to have a problem with, which is whether or not the SBP Act permits a change in diagnosis, I would like to explain that the Act does in fact permit the change in diagnosis for two reasons. First of all, the plain language of the re-examination process, and second of all, because of the nature of the initial commitment in the first place. It's the plain language that's repeated in both sections, 55 on re-examination and 55 on the probable cause hearing, that the annual re-examination's purpose is to determine whether the person's condition has so changed since the most recent periodic re-examination that he or she is no longer a sexually violent person. If you look to what that definition of sexually violent person is in Section 5F, no longer a sexually violent person would mean no longer having a mental disorder or no longer is substantially probable to re-offend. So the question at this stage is, has respondent's condition changed such that he no longer has a mental disorder? There's absolutely no language within the Act that says, has this respondent's condition changed such that he no longer has the mental condition upon which his initial commitment was based? And it wouldn't make sense to read the statute that way, because if we were to re-examine the offender only on the basis of whether or not he still suffers from a particular mental disorder upon which his initial commitment was based, but recognize that he has another mental disorder or his diagnosis has changed, we then be saying that, yes, he still qualifies as an SBP, but we're still going to let him out, and that's not what we want. Dr. Elster, do you agree with counsel's suggestion that he only has to show one or the other that he no longer has a mental disorder and not that he is no longer dangerous to others because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence? Do you agree with him that there's actually no requirement for him to show a plausible account on each of the required elements? Yes, Your Honor, we agree with that statement. The standard is that he has to demonstrate a plausible account through an expert opinion that he is no longer an SBP. So the requirements for an SBP are, after acknowledging that he has the predicate of violent offense, especially violent offense, the requirements are that he has a mental disorder and that mental disorder makes him substantially probable to commit future acts of sexual violence. So I don't think you answered the question. You just said he has to show a plausible account that he no longer has a mental disorder and that he's no longer dangerous to others because the disorder no longer creates a substantial probability that he will engage in acts of sexual violence. I think the counsel suggested that if he shows that he no longer has a mental disorder, that he's really dangerous. That makes sense, doesn't it? That does make sense, Your Honor. If he's demonstrated that he does not satisfy, if he's demonstrated that he does not satisfy one of the statutory elements of being an SBP, then he would be able to move on to an evidentiary hearing. The terminology SBP. But that's not what the language is as far as in the discharge procedure. He either has to show he no longer has a mental disorder or he's no longer dangerous to others because his mental disorder no longer creates a substantial probability. I mean, if he doesn't have a mental disorder, there'd be no reason for him to be convinced, correct? Correct. So you do agree with that? Yes. But you kept referring to the Sexual Violence in Persons Act. He's already been found to be a sexually violent person. But the Sexual Violence in Persons Act requires not only that he suffer from a mental disorder, but that it's also likely that if he were released, he would re-assent. That's correct, Your Honor. If I may, I'd like to address specifically the issues that Respondent has raised with regard to due process and just make some brief points about that. In particular, I just want to note that the SBP Act does not devoid procedural safeguards that would, in fact, protect Respondent's due process rights in discharge proceedings. In fact, the Act contains an abundance of procedural safeguards throughout the discharge proceedings that ensure that Respondent's due process rights are not violated. Now, Respondent is entitled to retain his own expert at the re-examination phase, and if he doesn't, he can ask the court to appoint one. Respondent was entitled to have an attorney at a probable cause hearing, and he had an attorney. And Respondent was provided with all kinds of procedural safeguards throughout an evidentiary hearing to ensure he established probable cause such that the court grants an evidentiary hearing. At that stage, the SBP Act provides every protection that due process under the U.S. Supreme Court precedent requires. It's provided a notice of time and place of the hearing, a right to be represented by counsel, a right to call and prosecute witnesses, he has a right to remain silent, he has a right to retain his own expert, as I said, he has a right to a jury. And importantly, the state bears the burden at that stage to prove by fairly convincing evidence that the individual is still an SBP. So we're not facing a situation where we're moving the goalpost every year and Respondent has no possible, as he describes it, an insurmountable burden where he can not possibly prove that he should be discharged. All he needs to prove is that all he needs to demonstrate is probable cause at the probable cause stage, at which point the burden shifts to the state again, and he's protected by everything that's provided under the United States Supreme Court precedent in terms of due process for those who are SBP. Those are arguments that Mr. Lieberman has never tried under the sexual statism of mental disorder, that there were never any facts or evidence presented to that, and then now at this point, you know, you point out that he actually may have had sexual statism, so therefore it wasn't his due process rights violated. Does he have an opportunity to address this? No, Your Honor. That brings me to my second point about the initial commitment proceeding in the first place, and that is that the Respondents are simply adjudicated SBPs. They're not adjudicated to be particular PNOS SBPs or statism SBPs or theory SBPs. They're adjudicated to be SBPs, and there are a variety of circumstances under which an individual would be committed. There are individuals, and at no point is the jury asked to adjudicate specifically what mental condition he has, or in this case, it was not asked to adjudicate whether he has PNOS non-consent. They were simply asked whether or not he had a mental condition that affected his emotional or volitional capacity and would predispose him to engaging in acts of sexual violence. So there are cases in which an individual might be diagnosed with one disorder and be adjudicated an SBP. There are cases where he'd be diagnosed with multiple disorders, and experts are finding that the individual's diagnoses work synergistically and that they feel of each other, and that that qualifies as a mental disorder under the Act. There are circumstances in which two experts might opine that the individual is an SBP, have a mental disorder under the Act, but they might differ with regard to which mental disorders that he has because different experts come to different conclusions. If an expert has a new diagnosis, would you agree with her here? Yes, the diagnosis was new. If an expert has a new diagnosis, and then another doctor... And Dr. Weidel agreed that it's not the same, right? Correct. That paraphernalia, not otherwise specified, is not the same as sexual statement. Did she agree with that? Correct. And what did Dr. First say about her? What was his basic opinion? Dr. First's opinion was also that these diagnoses are distinct. They're not interchangeable. You can't use the term TNLS, sexual statement, and just flip them around. There's no specific criteria. So can they raise a plausible account with this testimony that would warrant a hearing? No, Your Honor, because the requirements under both, according to Sandbridge and according to this court in the previous case involving a respondent that was affirmed by Sandbridge, required that an expert opine on the statutory elements as to the committed individual. In this case, no expert or respondent has opined as to his condition specifically on the statutory elements. He's raised a credibility issue through Dr. First's affidavit, which we, by the way, do not believe actually undermines Dr. Weidel's credibility at all. We believe that they agree on most of the issues here. But that credibility issue does not raise a plausible account. Credibility, as the court has admonished several times in other issues. Well, for 16 years he was diagnosed with something else, and now he's diagnosed with something new. That doesn't have any suggestion of a plausible account that he doesn't suffer from a mental disorder? If the one that he had all these other years is no longer there? No, because first of all, nobody has said that his condition has changed or that the mental disorder that he was diagnosed with previously is no longer there. They've only said that based on changes in the diagnostic manual, symptoms that were there consistently and that described respondent's condition could now be, could now, under the new professional standards, qualify as a suspect. He can't be described as a suspect. Anything further you want to add? No, Your Honor. Unless there's no further questions, we ask that the defendant no probable cause be affirmed. Thank you. Mr. Pesci, a brief rebuttal. Thank you, Your Honor. Just a few things on rebuttal. Of course, the Court has additional questions. I'd like to start by saying that in no other instance does our Constitution permit the State to change the basis for one's confinement without triggering some sort of procedural process. This would be the only instance where the entire underlying basis for commitment, whether criminal or otherwise, could so dramatically change from the issues that were presented to the jury to the reason for confinement this morning without triggering any procedural protection. And what the State would walk us into is a scenario whereby, based on dangerousness alone and based on an ever-moving target of defining mental disorder, we would get farther and farther away from the original jury proceeding. Now, the State may respond and say, but Mr. Lieberman has protections. He has Section 65. He has periodic re-exams. And in this instance, because of the change in diagnosis, those protections are completely inapplicable, and that's for two reasons. The first is that this is not an academic exercise, as the State contends. This is not an issue of, gee, isn't it interesting that these two things can both happen. There is testimony that was submitted to a jury. The jury found beyond a reasonable doubt that Mr. Lieberman had a mental disorder based on the evidence that was given to it. And this morning, Mr. Lieberman is in custody based on a different diagnosis. That is not an academic exercise. That is a legal exercise. The second reason is because of this, and the Corvin standards have said, and Holden, the protections that protect Mr. Lieberman after his jury verdict reside in the jury verdict. The re-examination process is not a new trial. It is whether or not a condition has substantially changed that warrants a re-evaluation of whether or not Mr. Lieberman needs to be in custody. And we submit that that circumstance has been met clearly in this case because the underlying diagnosis has so dramatically changed. To say that Mr. Lieberman bears the sole burden in this particular instance, not last year's re-examination and not next year's re-examination, but this re-examination, that Mr. Lieberman is the sole bearer of burden to exculpate himself from custody, while still living in a dangerous way from the protections that are set forth in the Act and that have been laid out by this Court. Mr. Lieberman's liberty is at stake. And that liberty is compromised this morning because he allegedly suffers from a mental disorder that compels his dangerousness. Is he dangerous? I don't know. I don't know that one can be dangerous outside the diagnosis of a mental disorder, but I do know that even if you are dangerous, even if statisticians say, this person is likely to re-exempt, they will commit another gun crime, they will commit another drug offense, statistically this person is going to die, we are not allowed to keep him in custody on that basis alone. There has to be some other reason. And in Crane, and in Hendricks, and in Sanderson, and in Hardin, and in Sandbridge, and this Court's decision in Mr. Lieberman's case, that reason has always been because there is a mental disorder that compels that violence. That is why we are allowed to keep Mr. Lieberman in custody. And this Court, this is not the first time I have been with Larry Lodge and Mr. Lieberman, and this is not the first time that Mr. Lieberman went down to Springfield, has said without him. But the reason Mr. Lieberman is in jail is because he has paraphernalia NLS. And the reason we know that is because the jury made that determination. And this morning, Mr. Lieberman woke up in custody, not with paraphernalia NLS, but with sexual assault. No one has ever tested that theory. No one has ever asked Dr. Ryder in front of a fact finder, what is the basis for her new theory. Mr. Lieberman is not required to submit an expert opinion that he doesn't have a mental disorder. This Court, in the case that counsel submitted a week ago, just reaffirmed that decision. All the circumstances we need show is a plausible account that he either no longer has a mental disorder, or is not substantially likely to be dangerous. And in this case, it has been clearly shown that the new diagnosis of sexual assaultism cannot satisfy the state's requirements for maintaining Mr. Lieberman's custody. Clearly, probable cause or no error has been satisfied under the Supreme Court's interpretation of those requirements and standards. I'll also add, sexual assaultism is not a new mental disorder. It has existed almost unchanged since the DSM-3, which issued in the late 90s. The DSM-4, the DSM-5, all have spiritually identical criteria for diagnosing sexual assaultism. Dr. First opined on this. Dr. Waddell admitted it under oath during her deposition. And yet, for the first time in October 2013, on the eve of the issuance of the DSM-5, Dr. Waddell changed her mind. Even though she testified that Mr. Lieberman didn't have sexual assaultism three months earlier, and even though Dr. Waddell testified that he had TNF three months earlier, and that that was why he needed to be committed, Dr. Waddell changed her mind. For no reason other than a change in the preamble of the DSM-5. The State had the opportunity to trial Mr. Lieberman for sexual assaultism in 2000, 2006. The State evaluators, Dr. Smear and a list of others, all have had the opportunity to evaluate Mr. Lieberman with the same diagnostic criteria available, the same reasons and evidence, and never came to a different conclusion other than Mr. Lieberman had TNF. And yet, for some reason, in October 2013, Dr. Waddell changed her mind. That change must be adjudicated. It has triggered protections under the Act for Mr. Lieberman, which cannot be ignored. Cannot be set aside. If Mr. Lieberman suffers from a mental disorder and is dangerous under the Act, he should be kept in custody. That, as of this morning, the reason for maintaining him in custody is highly in doubt and has never been tested. And even our rules about a dangerous person, about protecting the citizens of Illinois, must give way to the protections that we afford ourselves as citizens, protected by our Constitution, protected by due process, that say we can take away a person's liberty if they are dangerous, if they have a mental disorder which compels violence. But we cannot simply put a person in jail, throw away a key, and then change the reasons why we're keeping them. We do not allow that amongst ourselves, even when it means that we let a dangerous person go. I'm not saying that Mr. Lieberman is dangerous. I'm not saying he's likely to re-offend. We have reasons that have been litigated before us why we disagree with those provisions. But the question before we ask today is whether or not the state can capriciously change the disorder and trigger another under the Act that requires us to do nothing for Mr. Lieberman and to simply keep him there under a changing reason. And we will wonder, as Dr. Weiler, or the next evaluator, submits the next referral in October, what will the reason be this year? Perhaps it will be typhoid-related. Perhaps it will be necrosis-related. We don't know. And without an opportunity to at least challenge that diagnosis as to whether or not that should be the basis for his commitment, Mr. Lieberman would never leave Rushville, and I have submitted no individual would ever leave Rushville. Now that's an opportunity that we have as citizens to legislate, to amend our constitutions, to determine that we should take people that we are afraid of and put them in jail for forever. But that is not what is written now, and that is not what these courts have decided. So with that, Mr. Lieberman, respectfully, unless Your Honor has no questions, respectfully submits that he be discharged from custody, or at least, at the very least, given the opportunity to challenge his current commitment in front of the fact finder under the protections of the Act. All right. Thank you. Thank you. Thank you both counsel, and we will take the matter under revised order.